**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| OptimNet LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>Verizon Communications, Inc., Cellco Partnership d/b/a Verizon Wireless, Verizon Online LLC, Verizon Business Network Services LLC, Verizon Data Services LLC, Verizon Business Global LLC, Verizon Services Corp.,<br><br>*Defendants.* | Case No. 2:25-cv-00628<br><br>**Complaint for Patent Infringement**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., in which Plaintiff OptimNet LLC ("OptimNet") alleges as follows against Defendants Verizon Communications, Inc., Cellco Partnership d/b/a Verizon Wireless, Verizon Online LLC, Verizon Business Network Services LLC, Verizon Data Services LLC, Verizon Business Global LLC, and Verizon Services Corp. (collectively, "Verizon"):

## INTRODUCTION

1.      This complaint arises from Verizon's unlawful infringement of U.S. Patent Nos. 8,689,085 ("'085 patent"), 8,781,323 ("'323 patent"), 9,136,968 ("'968 patent"), 9,197,351 ("'351 patent"), and 9,825,710 ("'710 patent"), and (collectively, "Asserted Patents"). OptimNet is the exclusive licensee of the Asserted Patents.

2.      The Asserted Patents originate from the Electronics and Telecommunications Research Institute ("ETRI"), a non-profit, government-funded research institute in Daedeok, Korea. Among other areas of expertise, ETRI is one of the leading research institutes in the area of digital communications. ETRI has engaged in extensive work helping to develop optical network communications standards, including Next Generation Passive Optical Network 2 ("NG-PON2") standards related to technologies at issue here.  An NG-PON2 system supports multiple wavelength channels and enables flexibility to add capacity as the demand grows to 100 Gbit/s and beyond.

3.      Among other things, ETRI has been actively involved in the International Telecommunication Union – Telecommunication Standardization Sector ("ITU-T").  The Study Groups of ITU's Telecommunication Standardization Sector (ITU-T) assemble experts from around the world to develop international standards known as ITU-T Recommendations which act as defining elements in the global infrastructure of information and communication technologies ("ICTs"). International ICT standards avoid costly market battles over preferred technologies, and for companies from emerging markets, they create a level playing field which provides access to new markets. They are an essential aid to developing countries in building their infrastructure and encouraging economic development, and through economies of scale, they can reduce costs for all: manufacturers, operators and consumers.

4.      ETRI's work with ITU-T included involvement in developing the G.989.3 standard, which provides standards specifications for 40-Gigabit-capable passive optical networks (NG-PON2).  In view of ETRIs involvement in developing the G.989.3 standard, on January 19, 2015, ETRI submitted an IPR Information Statement and Licensing Declaration ("IPR

Declaration"), declaring that it holds granted and/or pending applications for patents, the use of which would be required to implement the G.989.3 standard. *See, e.g.*, https://www.itu.int/net4/ipr/details_ps.aspx?sector=ITU-T&id=G989_3-04 ("ETRI NG-PON2 IPR Declaration"). As part of ETRI's IPR Declaration, ETRI committed to "grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell implementations" of the G.989.3 standard. ETRI NG-PON2 IPR Declaration at 2. Thus, ETRI: 1) assisted in the development and implementation of standards to facilitate efficient and uniform implementation of 40-Gigabit-capable passive optical networks (NG-PON2); 2) properly notified the public that it holds granted and/or pending applications for patents, the use of which would be required to implement the G.989.3 standard; and 3) agreed to license the subject patents on a non-discriminatory basis and on reasonable terms and conditions.

5.     Despite the clear disclosure to the public, and further despite ETRI's representations that it would license the subject patents on a non-discriminatory basis and on reasonable terms and conditions, at no time did Defendants approach ETRI to discuss licensing any ETRI patents covering NG-PON2-related technology. Nor can Defendants claim ignorance of the G.989.3 standard, or the IPR disclosure process established by ITU-T, as Verizon *itself* appears to have contributed to the G.989.3 standard and indeed filed its *own* IPR Declaration relating to the standard. *See, e.g.*, http://www.itu.int/net4/ipr/details_ps.aspx?sector=ITU-T&id=G989_3-08. Thus Verizon: 1) knew of the standard; 2) knew of the ITU-T's IP disclosure requirements; 3) had access to all IPR Declarations filed by any entity contributing to the standard; and 4) intentionally developed its own G.989.3 compliant NG-PON2 networks without obtaining

a license to ETRI's patents covering aspects of this technology.  In short, Verizon either knew, or was willfully blind to the fact that it was infringing ETRI's patents.

6.      ETRI also worked with ITU-T to help develop Optical Transport Network ("OTN") protocols, including protocols related to Optical Transport Units 2, 3, and 4 ("OTU2", "OTU3", "OTU4").  An OTN is a system that defines how different signals are transported end-to-end over fiber optic networks.   An OTU is the digital wrapper used to frame and carry the adapted client signals across the network with integrity, monitoring, and error correction.  OTU2 carries a line rate of approximately 10.7 Gigabytes-per-second (Gbps). OTU3 carries a line rate of approximately 43.01 Gbps.  And OTU4 carries a line rate of approximately 111.81 Gbps.

7.      ETRI's work with ITU-T included involvement in developing the G.709/Y.1331 standard, which provides standards specifications for a layered network architecture that enables efficient, reliable, and transparent transport of client signals.  In view of ETRIs involvement in developing the G.709/Y.1331 standard, on October 15, 2009, ETRI submitted an IPR Information Statement and Licensing Declaration ("ETRI OTN IPR Declaration"), declaring that it holds granted and/or pending applications for patents, the use of which would be required to implement the G.709/Y.1331 standard.  Thus, ETRI: 1) assisted in the development and implementation of standards to facilitate efficient and uniform implementation of OTN / OTU protocols; 2) properly notified the public that it holds granted and/or pending applications for patents, the use of which would be required to implement the G.709/Y.1331 standard; and 3) agreed to license the subject patents on a non-discriminatory basis and on reasonable terms and conditions.

8.      Despite the clear disclosure to the public, and further despite ETRI's representations that it would license the subject patents on a non-discriminatory basis and on

reasonable terms and conditions, at no time did Defendants approach ETRI to discuss licensing any ETRI patents covering OTN / OTU related technology.  Nor can Defendants claim ignorance of the G.709/Y.1331 standard, as Verizon itself announced work for G.709 digital wrapper services.                                    *See,*                                                    *e.g.*,

https://www22.verizon.com/wholesale/solutions/solution/Optical%2BWave%2BService.html

("work is well underway for standards-based digital wrapper service known as ITU-T G.709"). And as discussed above, Verizon was well-aware of the ITU-T IPR disclosure process.  Thus Verizon: 1) knew of the standard; 2) knew of the ITU-T's IP disclosure requirements; 3) had access to all IPR Declarations filed by any entity contributing to the standard; and 4) intentionally developed its own G.709/Y.1331 compliant services without obtaining a license to ETRI's patents covering aspects of this technology.  In short, once again, Verizon either knew, or was willfully blind to the fact that it was infringing ETRI's patents.

## <u>PARTIES</u>

9.      Plaintiff OptimNet is a Texas limited liability company with its principal place of business at 102 N College Ave 1038, Tyler, TX 75702.

10.      On information and belief, Verizon Communications, Inc. is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business at 1095 Avenue of the Americas, New York, NY 10036.

11.      On information and belief, Defendant Cellco Partnership, d/b/a Verizon Wireless ("Verizon Wireless") is a Delaware partnership, with its principal place of business at One Verizon Way, Basking Ridge, New Jersey 07920.

12.    On information and belief, Verizon Online LLC is a Delaware limited liability company with a principal place of business at 22001 Loudoun County Parkway, Ashburn, VA 20147.

13.    On information and belief, Verizon Business Network Services LLC ("Verizon Business Network") is a Delaware limited liability company with a principal place of business at 22001 Loudoun County Parkway, Ashburn, VA 20147.

14.    On information and belief, Verizon Data Services LLC is a limited liability company organized and existing under the laws of the state of Delaware, with a principal place of business at 7701 E. Telecom Parkway, Mail Code B3E, Temple Terrace, Florida 33637.

15.    On information and belief, Verizon Business Global LLC is a limited liability company organized and existing under the laws of the state of Delaware, with a principal place of business at One Verizon Way, Basking Ridge, New Jersey 07920.

16.    On information and belief, Verizon Services Corp. is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business at 1717 Arch Street, 21st Floor, Philadelphia, PA 19103.

17.    On information and belief, each of the above Verizon entities may be served through their registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## JURISDICTION AND VENUE

18.    This action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq.

19.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

20.    This Court has personal jurisdiction over Defendants in this action because Defendants have committed acts of infringement within this District giving rise to this action, have a regular and established place of business in this District, and have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Defendants, directly and/or through subsidiaries or intermediaries, conduct their business extensively throughout Texas, by shipping, distributing, offering for sale, selling, and advertising their products and/or services in Texas and the Western District of Texas, regularly do business or solicit business, engage in other persistent courses of conduct, and/or derive substantial revenue from products and/or services provided to individuals in Texas.

21.    With respect to the '085 patent, Verizon has committed acts of infringement of the '085 patent in this District by, among other things, supplying, distributing, developing, making, using, offering to sell, and selling products and services that infringe the '085 patent, including, without limitation, the network devices that employ Verizon's OTU4 network, such as Verizon's deployment of Infinera XTM Series hardware, including, without limitation, the TP100GOTN transponder and MXP200GOTN muxponder, which utilize the ITU-T G.709/Y.1331 OTU4 infrastructure across Verizon's optical backbone.  This further includes, without limitations, Verizon's wavelength services products, including customer premise network equipment (CPNE), such as the Infinera products discussed above, as well as, without limitation, the Alcatel-Lucent 7450 ESS, Ciena, and Nokia-Seimens optical transport systems.

22.    For example, in 2020, "Verizon [] worked with Infinera to successfully test 800G on a single wavelength over 400 miles on its long-haul network between Dallas and Atlanta." *See,*

*e.g.*, Linda Hardesty, Verizon works with Infinera on 800G transport to support 5G, FIERCE Network (available at https://www.fierce-network.com/operators/verizon-works-infinera-800g-transport?) (last accessed June 11, 2025). "Verizon is 'pushing hard' on its optical transport work 'to move up the stack' because it anticipates a lot more traffic as technologies such as 5G, edge compute and artificial reality take root." *Id*. "Verizon says the specific trial with Infinera is a piece of a much bigger evolution story connected with the 5G network." *Id*. "In order to advance 5G, the core network and the fiber network have to advance as well." *Id*.

23.    As discussed in Infinera's SEC filings, Infinera's XTM and XTG Series products, utilized by Verizon, "are designed to address the metro market, with 100 Gb/s metro core/regional transport capabilities and packet-optical solutions optimized for fast-growing applications in the access portion of the network." *See, e.g.*, Infinera Corporation Form 10-K (February 23, 2017) (available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001138639/38fd9ed6-785e-4f71-8ed4-4def783de270.pdf) (last accessed June 11, 2025).

24.    Additionally, Infinera's XTM II platform, utilized by Verizon, "supports a broad range of client signals, including 10G/40G/100G Ethernet and Optical Transport Network (OTN) as well as 8/16/32G Fibre Channel." *See, e.g.,* Anna Vue, Infinera Unveils XTM II for Cloud Scale Metro Packet-Optical Applications, Telecom Ramblings (available at https://newswire.telecomramblings.com/2017/06/infinera-unveils-xtm-ii-cloud-scale-metro-packet-optical-applications/) (last accessed June 11, 2025).

25.    Defendants also commit acts of infringement of OptimNet's patents in this District by, among other things, supplying, distributing, developing, making, using, offering to sell, and selling products and services that infringe the '968, '351, '710, and '323 patents, including, without

limitation, the network devices used to employ Verizon's NG-PON2 network, such as Optical Line Terminals (OLTs) (including, but not limited to, the Calix AXOS E9-2 Intelligent Edge System), and Optical Network Terminals (ONTs) (including, but not limited to, the Nokia TW-210X-A ONT, as well as the Calix 812NG-V ONT).

26.    Verizon operates one or more fiber-optic networks within the United States. *See, e.g.,* Mike Dano, The Story Behind Verizon's 5G Secret Weapon, LightReading (July 8, 2019) (available at https://www.lightreading.com/5g/the-story-behind-verizon-s-5g-secret-weapon) (last visited June 11, 2025).  One or more of these fiber-optic networks are within Texas and within this District.  *See, e.g., Iarnarch Technologies Ltd. v. Verizon Communications, Inc. et al*., 2:23-cv-00631, ECF No. 31 (March 8, 2024) ("Verizon Iarnarch Answer"), ¶ 14 ("Verizon admits that certain Verizon entities operate fiber optic networks within the United States and that certain Verizon entities use fiber optic technology within this District.").

27.    Verizon uses NG-PON2-type networks to support and provide wireless, residential, and business services.  *See, e.g.,* Verizon's Network Roadmap includes NGPON-2 and Open Daylight, IEEE ComSoc Technology Blog (August 22, 2018) (available at https://techblog.comsoc.org/2018/08/22/10597/) (last visited June 11, 2025).

28.    Verizon has an OpenOMCI specification to address the interoperability needs of NG-PON2 deployments and allow multiple third party ONT vendors to develop compliant and interoperable products that can be deployed in Verizon's fiber-optic networks.  *See, e.g.,* Verizon OpenOMCI Specification, Version 1.00 (June 30, 2017) (available at https://www.verizon.com/about/sites/default/files/Verizon-OpenOMCI-Specification.docx) (last visited June 11, 2025).

29.    On information and belief, these NG-PON2-type networks are used in Texas and this District.

30.    Glenn Wellbrock, Verizon's Director of Optical Transport, Design, and Planning, stated Verizon will deploy NG-PON2 in all 30 markets where it currently plans to roll out 5G mobile  services.  *See, e.g.,* Steve Hardy, Verizon full speed ahead with NG-PON2 for 5G mobile     support,     Lightwave     (June     6,     2019)     (available     at https://www.lightwaveonline.com/fttx/pon-systems/article/14034625/verizon-full-speed-ahead-with-ng-pon2-for-5g-mobile-support) (last visited June 11, 2025).

31.    Glenn Wellbrock presented "NG-PON2 enabling the services of tomorrow!" at a Broadband Forum Broadband Acceleration Seminar entitled "NG-PON2 Roadmap and  Evolution – A Universal Platform for Residential, Business, and Wireless/5G?"  *See, e.g.,* Broadband Forum Broadband Acceleration Seminar, Agenda and Schedule (available at https://www.broadband-forum.org/download/BASeOFCAgenda2019.pdf) (last visited June 11, 2025).

32.    At this same conference, Rajesh Yadav, Associate Fellow at Verizon, presented "Verizon's NG-PON2 Deployment  Update."  *Id.* Verizon's NG-PON2-type networks are used to support various services including cellular backhaul, broadband internet access, and cable television offerings. These services are provided under brand names including, but not limited to, "Verizon," "5G," "5G Ultra Wideband," and "Fios."

33.    On information and belief, Verizon offers 5G Ultra Wideband, 5G, and 4G LTE internet services in Texas and this District.  *See, e.g.,* Verizon Coverage Map (available at https://www.verizon.com/coverage-map/) (last visited June 11, 2025); *see also* Verizon Iarnarch Answer, ¶ 21 ("Verizon admits that Cellco Partnership d/b/a Verizon Wireless offers 5G Ultra

Wideband, 5G, and 4G LTE cellular network services in Texas and in this district, and that its customers can access the internet using these services.").

34.     On information and belief, Verizon's One Fiber project provides fiber support for its service offerings, including backhaul and broadband. *See, e.g.*, Diana Goovaerts, What's going on with Verizon's One Fiber project?, FIERCE Network (January 9, 2023) (available at https://www.lightreading.com/5g/the-story-behind-verizon-s-5g-secret-weapon) (last visited June 11, 2025); *see also* Verizon Iarnarch Answer, ¶ 22 ("Verizon admits that One Fiber provides fiber support for its service offerings…").

35.     On information and belief, Verizon uses One Fiber to reduce Verizon's need to backhaul its 5G traffic across cable networks. *See, e.g.,* Diana Goovaerts, What's going on with Verizon's One Fiber project?, FIERCE Network (January 9, 2023) (available at https://www.lightreading.com/5g/the-story-behind-verizon-s-5g-secret-weapon) (last visited June 11, 2025); *see also* Verizon Iarnarch Answer, ¶ 23 ("Verizon admits that One Fiber can reduce the need to backhaul 5G traffic across cable networks…").

36.     As of November 2023, Verizon was serving approximately 51% of its cell sites with its own deployed fiber-optic cables and has deployed tens of thousands of miles of fiber-optic lines with the goal of providing backhaul fiber connections to its cell sites. Verizon Iarnarch Answer, ¶ 24.

37.     An efficient and optimized 5G small-cell deployment (*e.g.*, to support mmWave bands) depends on a fiber backhaul. *See, e.g*., Fiber optics and requirements in 5G infrastructure, Essentra Components (December 2021) (available at https://www.essentracomponents.com/en-

us/news/industries/telecoms-data/fiber-optics-and-requirements-in-5g-infrastructure) (last visited June 11, 2025).

38.     Version uses its end-to-end deep fiber resources throughout its 5G Ultra Wideband network.    *See, e.g.,* Verizon Fiber Optic Network (available at https://www.verizon.com/about/our-company/high-speed-broadband) (last visited June 11, 2025); *see also* Verizon Iarnarch Answer, ¶ 26 ("Verizon admits that end-to-end deep fiber resources are used throughout its 5G Ultra Wideband network…").

39.     On information and belief, Verizon advertises that its broadband internet services are available in the United States, including in Texas and within the Eastern District of Texas.

40.     Verizon advertises 5G Ultra Wideband service at the address 2800 North Franklin Street, Marshall, Texas 75670.    *See, e.g.*, Verizon Coverage Locator (available at https://www.verizon.com/coverage-map/) (last visited June 11, 2025); *see also* Verizon Iarnarch Answer, ¶ 29 ("Admitted.").

41.     Verizon advertises 5G Ultra Wideband service at the address 1105 Mossvine Drive, Plano, Texas 75023.    *See, e.g.*, Verizon Coverage Locator (available at https://www.verizon.com/coverage-map/) (last visited June 11, 2025); *see also* Verizon Iarnarch Answer, ¶ 30 ("Admitted.").

42.     Verizon advertises 5G Ultra Wideband service at the address 1207 East Richards Street, Sherman, Texas 75090.    *See, e.g.*, Verizon Coverage Locator (available at https://www.verizon.com/coverage-map/) (last visited June 11, 2025); *see also* Verizon Iarnarch Answer, ¶ 31 ("Admitted").

43.     Verizon advertises 5G Ultra Wideband service in numerous counties in the Eastern District of Texas.  *See, e.g.*, Verizon Coverage Locator (available at https://www.verizon.com/coverage-map/) (last visited June 11, 2025);  *see also* Verizon Iarnarch Answer, ¶ 32 ("Admitted.").

44.     On information and belief, this cellular internet service is supported by the same fiber backhaul detailed above.

45.     On information and belief, Verizon has invested heavily in fiber and upgraded its Texas fiber networks, including networks in this district.

46.     Verizon has upgraded Verizon cellular networks, including 5G Ultra Wideband cellular networks, throughout Texas.  Verizon Iarnarch Answer, ¶ 35 ("Verizon admits that certain Verizon entities have upgraded Verizon cellular networks including 5G Ultra Wideband cellular networks throughout Texas.").

47.     On information and belief, when Verizon deploys support for 5G Ultra Wideband, the deployment requires upgraded fiber backhaul. *See, e.g.,* Verizon Iarnarch Answer, ¶ 36 ("Verizon admits that Verizon's as-deployed 5G Ultra Wideband includes upgraded fiber backhaul…").

48.     Verizon has used fiber-optic backhaul to move data between cell sites in the Dallas area.  *See, e.g.*, Verizon upgrades network for Dallas customers, Yahoo Finance (June 6, 2023) (available at https://finance.yahoo.com/news/verizon-upgrades-network-dallas-customers-130000661.html) (last visited June 11, 2023).

49.     Verizon has numerous employees in the State of Texas, and in or near this judicial district, who work on fiber-optic networks. On information and belief, those employees work on fiber-optic networks, including NG-PON2-type networks, in this district.  *See, e.g.,* Verizon

Iarnarch Answer, ¶ 41 ("Verizon admits that certain Verizon entities have employees in the State of Texas and in Eastern District of Texas that work on fiber optic networks.").

50.    For example, on information and belief, at the time of filing this Complaint, Verizon employs Mr. Andrew Yancey as a Network Design Engineer in Schertz, TX.  Mr. Yancey has experience relating to fiber deployment and FTTP (fiber to the premises).  *See, e.g.*, Yancey LinkedIn (available at https://www.linkedin.com/in/andrew-yancey-770895118 (last visited June 11, 2025).

51.    As another example, on information and belief, Verizon employed Mr. Scott Hosley in the Dallas-Fort Worth metropolitan area.  During his employment at Verizon, Mr. Hosley worked on One Fiber builds in the Dallas-Fort Worth metropolitan area.  *See, e.g.*, Hosley LinkedIn (available at https://www.linkedin.com/in/scott-hosley) (last visited June 11, 2025).

52.    Numerous Verizon retail stores are located within this judicial District, including in Allen, Athens, Beaumont, Canton, Carthage, Denton, Frisco, Gilmer, Henderson, Kilgore, Lindale, Longview, Lufkin, Marshall, Nacogdoches, Sulphur Springs, Texarkana, and Tyler.  *See, e.g.,* Verizon Store Locator (available at https://www.verizon.com/stores/) (last visited June 11, 2025); *see also* Verizon Iarnarch Answer, ¶ 50 ("Verizon admits that Cellco Partnership d/b/a Verizon Wireless maintains multiple retail stores within the Eastern District of Texas…"). Verizon uses these stores to sell services and devices that utilize Verizon's 5G network, including its fiber-optic backhaul that infringes the Asserted Patents (as discussed below). These stores are physically located within the district, are regular and established places of business of Verizon with signage of Verizon, and actively market Verizon's network services.

53.     On information and belief, Verizon maintains multiple regular and established physical places of business in the Eastern District of Texas, including, for example, the stores located at each of 500 East Loop 281, Longview, TX 75605; 2414 Gilmer Rd., Ste 1, Longview TX 75604; 2040 Crockett Road, Palestine, TX 75801; 8988 South Broadway Avenue, Tyler, TX 75703; 1016 West Southwest Loop 323, Tyler, TX 75701; 2035 N. Central Expy., McKinney, TX 75070; and 1006 E. End Blvd. N., Marshall, Texas 75670.  *See, e.g.* Verizon Iarnarch Answer, ¶ 51.

54.     Verizon has solicited business in the State of Texas, transacted business within the State of Texas and attempted to derive financial benefit from residents of the State of Texas, including benefits directly related to the patent infringement cause of action set forth herein.  *See, e.g.* Verizon Iarnarch Answer, ¶ 52 ("Verizon admits that certain Verizon entities have solicited and transacted business within the State of Texas…").

55.     On information and belief, Verizon has manufactured, used, sold, and/or offered for sale Verizon fiber backhaul and network services in the State of Texas and this judicial district. *See, e.g.* Verizon Iarnarch Answer, ¶ 53 ("Verizon admits that certain Verizon entities have used fiber backhaul and network services in the Eastern District of Texas.").

56.     Upon information and belief, at the time of filing of this Complaint, Verizon 5G Ultra Wideband service (utilizing fiber-optic backhaul) is available to consumers in Texas, including within this judicial District.  *See, e.g.* Verizon Iarnarch Answer, ¶ 54 ("Verizon admits that Cellco Partnership d/b/a Verizon Wireless operates cellular services branded as 5G Ultra Wideband that use fiber-optic backhaul and that 5G Ultra Wideband services are available in the Eastern District of Texas…").

57.    Upon information and belief, Verizon's 5G Ultra Wideband network and network services, which are available in this judicial district, are implemented in part by Verizon's fiber-optic networks that are accused of infringement in this Complaint.

58.    On information and belief, Verizon derives benefits from its presence in this federal judicial district, including, but not limited to, sales revenue.  For example, Verizon receives revenue from its corporate stores in this district, by selling network access (via cell towers relying on fiber-optic backhaul), products, and services, and by receiving payment for its network access, products, and services.  *See, e.g.* Verizon Iarnarch Answer, ¶ 56 ("Verizon admits that Cellco Partnership d/b/a Verizon Wireless operates cellular networks in the Eastern District of Texas that generate sales revenue…").

59.    Verizon's commission of acts of infringement, and the presence of Verizon retail stores in the Eastern District of Texas, establishes venue over it under 28 U.S.C. § 1400(b). *See, e.g.*, *Intellectual Ventures II LLC v. FedEx Corp.*, Case No. 16-cv-980-JRG, 2017 WL 5630023, at *6–7 (E.D. Tex. Nov. 22, 2017) (Gilstrap, J.) (venue proper based on defendants' "physical retail and service locations").

60.    In other recent actions, Verizon has either admitted or not contested that this federal judicial district is a proper venue for patent infringement actions against it. *See, e.g.*, Answer ¶ 16 & Counterclaims ¶ 6, *IPCom, Gmbh & Co. KG v. Verizon Comm'ns Inc., et al.*, No. 2:20-cv-322 (E.D. Tex. Dec. 21, 2020), ECF No. 23; Am. Answer to Am. Compl. ¶¶ 14, 17, *Sol IP v. Verizon Comm'ns Inc., et al.*, No. 2:18-cv-526 (E.D. Tex. Sept. 18, 2019), ECF No. 180; Answer ¶ 6, *Traxcell Techs., LLC v. Verizon Comm'ns, Inc., et al.*, No. 2:17-cv-721 (E.D. Tex. Jan. 22, 2018), ECF No. 8; Answer ¶ 15, *Cellular Comm'ns Equip., LLC v. Apple Inc., et al.*, No. 6:17-cv-146

(E.D. Tex. June 29, 2017), ECF No. 44. Verizon has also admitted or failed to contest that it has transacted business in this district. *See, e.g.*, Sol IP, Am. Answer to Am. Compl. ¶¶ 13, 16; Cellular Comm'ns, Answer ¶¶ 6, 16; Answer ¶ 7, *Plectrum LLC v. Verizon Comm'ns Inc., et al.*, No. 4:17-cv-126 (E.D. Tex. Apr. 19, 2017), ECF No. 21.

61.    Verizon is subject to personal jurisdiction under the provisions of the Texas Long Arm Statute, TX CIV. PRAC. & REM CODE § 17.041 et seq., by virtue of the fact that, upon information and belief, Verizon has availed itself of the privilege of conducting and soliciting business within this State, including engaging in at least some of the infringing activities in this State, as well as by others acting as Verizon's agents and/or representatives, such that it would be reasonable for this Court to exercise jurisdiction consistent with principles underlying the U.S. Constitution, and the exercise of jurisdiction by this Court would not offend traditional notions of fair play and substantial justice.

62.    On information and belief, Verizon has also established minimum contacts with this judicial district and regularly transacts and does business within this district, including advertising, promoting and selling products and/or services in its stores, over the internet, through intermediaries, representatives and/or agents located within this judicial district, that infringe the asserted patents. On further information and belief, Verizon has purposefully directed activities at citizens of this State including those located within this judicial district. On information and belief, Verizon derives substantial revenue from the goods and services it provides to individuals in the state of Texas and in this judicial district.

63.    On information and belief, Verizon has purposefully and voluntarily placed its products and/or services into the stream of commerce with the expectation that they will be

purchased and used by customers located in the State of Texas and the Eastern District of Texas. On information and belief, Verizon's customers in the Eastern District of Texas have purchased and used and continue to purchase and use Verizon's products and/or services.

64.    Venue as to Verizon is proper in this judicial district under 28 U.S.C. §§1391(b)-(c) and 1400(b) at least because Verizon has committed acts of infringement in this judicial district and has a regular and established place of business in this judicial district. Each Defendant makes, uses, sells, offers to sell, and/or imports products and/or services accused of infringement in this case into and/or within this judicial district and maintains a permanent and/or continuing presence within this judicial district. On information and belief, each Defendant has transacted and, at the time of the filing of the Complaint, is continuing to transact business within this judicial district.

65.    Defendants are properly joined under 35 U.S.C. § 299(a)(1) because, on information and belief, Defendants commonly and/or jointly make, use, sell, offer to sell, and/or import infringing instrumentalities, such that at least one right to relief is asserted against Defendants jointly, severally, and in the alternative with respect to the same transactions, occurrences, or series of transactions or occurrences relating to the making, using, selling, offering to sell, and/or importing into the United States the same accused instrumentalities, as set forth in greater detail herein.

66.    Defendants are properly joined under 35 U.S.C. § 299(a)(2) because, on information and belief, Defendants make, use, sell, offer to sell in, and/or import into the United States the same or similar accused instrumentalities, such that questions of fact that are common to all Defendants will arise in this action.

## COUNT 1 – INFRINGEMENT OF THE '968 PATENT

67.    OptimNet incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

68.    On September 15, 2015, the United States Patent and Trademark Office issued U.S. Patent No. 9,136,968, titled "Time and wavelength division multiplexing—passive optical network (TWDM-PON) system and communication link method thereof."

69.    OptimNet is the exclusive licensee of the '968 patent with all substantial rights in the '968 patent including, without limitation, the exclusive right to sublicense, sue for infringement, and collect all past, present, and future damages.

70.    The claims of the '968 patent were duly issued by the United States Patent and Trademark Office and are presumed by statute to be valid.

71.    The claims of the ' 968 patent are patent eligible under 35 U.S.C. § 101.

72.    The claims of the ' 968 patent are not directed to abstract ideas and recite technical solutions to technical problems related to PON systems, e.g.:

> Such a TWDM-PON system includes a plurality of OLTs, and traffic imbalance may be caused according to whether an ONU being communication-connected to any OLT operates. For example, ONUs which has established communication link to a particular OLT or the OLT #1 generate heavy traffics according to a network state or time, but ONUs being communication-connected to OLTs other than the particular OLT hardly generate traffics, so that it leads to traffic imbalance between PON links. In this case, traffic loads occurs in the OLT #1, especially a PON link of a wavelength that is used by the OLT **1**#, so all the ONUs being communication-connected to the OLT #1 may not receive a service with decent quality and may not utilize the entire PON links efficiently. In addition, every OLT provides a service even during the night time where traffic loads are usually significantly reduced compared to the day time, so that network resources may be unnecessarily used

'968 patent, 2:45-61.

73.    The written description of the '968 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

74.    Defendants have directly infringed (literally and equivalently) and induced others to infringe the '968 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '968 patent and by inducing others to infringe the claims of the '968 patent without a license or permission from OptimNet, such as for example inducing home and business internet customers to use the infringing system.

75.    Exhibit 1 is a true and correct copy of the '968 patent.  Exhibit 2 provides a description of the Accused Instrumentalities and a chart showing how they infringe claim 1 of

the '968 patent, which OptimNet provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

76.    Defendants knowingly and intentionally induce and contribute to infringement of the '968 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or have been willfully blind to the '968 patent and the infringing nature of the Accused Instrumentalities for at least the reasons discussed above. *See* Introduction, which is incorporated by reference herein.

77.    Despite this knowledge, Defendants continue to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '968 patent. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '968 patent, thereby specifically intending for and inducing their customers to infringe the '968 patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

78.    Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers would constitute willful infringement of the '968 patent.  As discussed above, ETRI, the former assignee of the Asserted Patents, previously submitted an Intellectual Property Rights (IPR) disclosure to the International Telecommunication Union – Telecommunication Standardization Sector (ITU-T),

alerting the public that it holds granted and/or pending applications for patents, the use of which would be required to implement the G. 989.3 standard. This disclosure was made publicly available through ITU-T's Patent Information database, thereby placing the industry—including Defendants—on notice of ETRI's (and subsequently OptimNet's) patent rights in connection with standard-compliant implementations.

79.     Despite this public notice, Defendants continued, and continue, to make, use, and sell standard-compliant products without seeking a license or otherwise addressing OptimNet's intellectual property rights. Defendants' actions demonstrate, at minimum, reckless disregard for OptimNet's patent rights, and constitute egregious behavior sufficient to support a finding of willful infringement under the guidance set forth in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016).

80.     The requirements of 35 U.S.C. § 287(a) have been satisfied with respect to the '968 patent, and OptimNet is entitled to damages for Defendants' past infringement.

81.     OptimNet has been damaged by Defendants' infringement of the '968 patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## <u>COUNT 2 – INFRINGEMENT OF THE '351 PATENT</u>

82.     OptimNet incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

83.     On November 24, 2015, the United States Patent and Trademark Office issued U.S. Patent No. 9,197,351, titled "Method of selecting wavelength of optical network unit in passive optical network."

84.    OptimNet is the exclusive licensee of the '351 patent with all substantial rights in the '351 patent including, without limitation, the exclusive right to sublicense, sue for infringement, and collect all past, present, and future damages.

85.    The claims of the '351 patent were duly issued by the United States Patent and Trademark Office and are presumed by statute to be valid.

86.    The claims of the '351 patent are patent eligible under 35 U.S.C. § 101.

87.    The claims of the '351 patent are not directed to abstract ideas and recite technical solutions to technical problems related to PON systems, e.g.:

> In order to register an optical network unit/optical network terminal (ONU/ONT, hereinafter referred to as an 'ONU' or a 'terminal') in this hybrid type passive optical network and perform a communication, it is necessary for the terminal to assign a wavelength to be used initially. Methods of assigning an initial available wavelength for the terminal include, a method in which a terminal is firstly connected to a master optical line terminal (OLT) and the master OLT assigns a wavelength to be used in the terminal and informs the terminal of the wavelength, and a method in which an arbitrary wavelength is selected as an initial wavelength and a firstly connected OLT informs the terminal of the wavelength to be used.
>
> However, these methods require the master OLT to know conditions of all other OLTs in advance or each OLT to know conditions of all other OLTs in advance. In addition, it is difficult to use in a network in which systems supporting different protocols are mixed, for example, the EPON and the GPON. Further, since contents are not defined in the existing OLT, it is difficult to implement and manage.

'351 patent, 1:58-2:11.

88.    The written description of the '351 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from

and improved upon what may have been considered conventional or generic in the art at the time of the invention.

89.    Defendants have directly infringed (literally and equivalently) and induced others to infringe the '351 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '351 patent and by inducing others to infringe the claims of the '351 patent without a license or permission from OptimNet, such as for example inducing home and business internet customers to use the infringing system.

90.    Exhibit 3 is a true and correct copy of the '351 patent.  Exhibit 4 provides a description of the Accused Instrumentalities and a chart showing how they infringe claim 1 of the '351 patent, which OptimNet provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

91.    Defendants knowingly and intentionally induce and contribute to infringement of the '351 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or have been willfully blind to the '351 patent and the infringing nature of the Accused Instrumentalities for at least the reasons discussed above. *See* Introduction, which is incorporated by reference herein.

92.    Despite this knowledge, Defendants continue to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '351 patent. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '351 patent, thereby specifically intending for and inducing their customers to infringe the '351 patent through the normal and

customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

93.     Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers would constitute willful infringement of the '351 patent.  As discussed above, ETRI, the former assignee of the Asserted Patents, previously submitted an Intellectual Property Rights (IPR) disclosure to the International Telecommunication Union – Telecommunication Standardization Sector (ITU-T), alerting the public that it holds granted and/or pending applications for patents, the use of which would be required to implement the G. 989.3 standard.  This disclosure was made publicly available through ITU-T's Patent Information database, thereby placing the industry—including Defendants—on notice of ETRI's (and subsequently OptimNet's) patent rights in connection with standard-compliant implementations.

94.     Despite this public notice, Defendants continued, and continue, to make, use, and sell standard-compliant products without seeking a license or otherwise addressing OptimNet's intellectual property rights. Defendants' actions demonstrate, at minimum, reckless disregard for OptimNet's patent rights, and constitute egregious behavior sufficient to support a finding of willful infringement under the guidance set forth in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016).

95.     The requirements of 35 U.S.C. § 287(a) have been satisfied with respect to the '351 patent, and OptimNet is entitled to damages for Defendants' past infringement.

96.     OptimNet has been damaged by Defendants' infringement of the '351 patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## <u>COUNT 3 – INFRINGEMENT OF THE '710 PATENT</u>

97.     OptimNet incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

98.     On November 21, 2017, the United States Patent and Trademark Office issued U.S. Patent No. 9,825,710, titled "Method and system for determining and controlling power of optical transmitter of optical network unit for time and wavelength division multiplexing passive optical network."

99.     OptimNet is the exclusive licensee of the '710 patent with all substantial rights in the '710 patent including, without limitation, the exclusive right to sublicense, sue for infringement, and collect all past, present, and future damages.

100.    The claims of the '710 patent were duly issued by the United States Patent and Trademark Office and are presumed by statute to be valid.

101.    The claims of the '710 patent are patent eligible under 35 U.S.C. § 101.

102.    The claims of the '710 patent are not directed to abstract ideas and recite technical solutions to technical problems related to PON systems, e.g.:

> The present invention is directed to a method and system for determining and controlling power of optical transmitters of ONUs connected to OLT ports to reduce signal quality degradation due to a crosstalk between TWDM-PON channels.

'710 patent, 2:8-12.

* * *

According to an aspect of the present invention, there is provided a method for determining and controlling power of an optical transmitter of an optical network unit (ONU) provided for a time and wavelength division multiplexing passive optical network (TWDM-PON) system, the method including: collecting received signal strength indication (RSSI) information from upstream optical signals received from the ONUs connected to optical line terminal (OLT) ports; gathering, the pieces of RSSI information about the ONUs from the OLT ports, and determining power of optical transmitters of the ONUs based on the gathered information; transmitting determined power mode setting information of the optical transmitters of the ONUs to the OLT ports; and generating a physical layer operation and maintenance (PLOAM) message to control power modes of the ONUs based on the power mode setting information of the optical transmitter, and transmitting the PLOAM message to the ONUs from the OLT ports.

'710 patent, 2:8-54.

103.    The written description of the '710 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

104.    Defendants have directly infringed (literally and equivalently) and induced others to infringe the '710 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '710 patent and by inducing others to infringe the claims of the '710 patent without a license or permission from OptimNet, such as for example inducing home and business internet customers to use the infringing system.

105.    Exhibit 5 is a true and correct copy of the '710 patent.  Exhibit 6 provides a description of the Accused Instrumentalities and a chart showing how they infringe claim 1 of

the '710 patent, which OptimNet provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

106.    Defendants knowingly and intentionally induce and contribute to infringement of the '710 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or have been willfully blind to the '710 patent and the infringing nature of the Accused Instrumentalities for at least the reasons discussed above. *See* Introduction, which is incorporated by reference herein.

107.    Despite this knowledge, Defendants continue to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '710 patent. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '710 patent, thereby specifically intending for and inducing their customers to infringe the '710 patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

108.    Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers would constitute willful infringement of the '710 patent.  As discussed above, ETRI, the former assignee of the Asserted Patents, previously submitted an Intellectual Property Rights (IPR) disclosure to the International Telecommunication Union – Telecommunication Standardization Sector (ITU-T),

alerting the public that it holds granted and/or pending applications for patents, the use of which would be required to implement the G. 989.3 standard.  This disclosure was made publicly available through ITU-T's Patent Information database, thereby placing the industry—including Defendants—on notice of ETRI's (and subsequently OptimNet's) patent rights in connection with standard-compliant implementations.

109.    Despite this public notice, Defendants continued, and continue, to make, use, and sell standard-compliant products without seeking a license or otherwise addressing OptimNet's intellectual property rights. Defendants' actions demonstrate, at minimum, reckless disregard for OptimNet's patent rights, and constitute egregious behavior sufficient to support a finding of willful infringement under the guidance set forth in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016).

110.    The requirements of 35 U.S.C. § 287(a) have been satisfied with respect to the '710 patent, and OptimNet is entitled to damages for Defendants' past infringement.

111.    OptimNet has been damaged by Defendants' infringement of the '710 patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## COUNT 4 – INFRINGEMENT OF THE '323 PATENT

112.    OptimNet incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

113.    On July 15, 2014, the United States Patent and Trademark Office issued U.S. Patent No. 8,781,323, titled "Packet transport layer passive optical network (PTL-PON) providing system and method."

114.    OptimNet is the exclusive licensee of the '323 patent with all substantial rights in the '323 patent including, without limitation, the exclusive right to sublicense, sue for infringement, and collect all past, present, and future damages.

115.    The claims of the '323 patent were duly issued by the United States Patent and Trademark Office and are presumed by statute to be valid.

116.    The claims of the '323 patent are patent eligible under 35 U.S.C. § 101.

117.    The claims of the '323 patent are not directed to abstract ideas and recite technical solutions to technical problems related to PON systems, e.g.:

> A PTL path **400** of the metro network **100** and the core network **200** is set by a server (not shown) and managed the path state. However, only physical links of concentration channels **40**, **41**, and **42** and distribution channels **43**, **44**, and **45** are set by an E-PON server, but the channel states are not managed.
>
> Here, the channels **40**, **41**, and **42** from the ONT or ONU **20** of the subscriber ends **10**, **11**, and **12** are concentrated at the first concentration switch **30**, and the distribution channels **43**, **44**, and **45** are distributed from the second concentration switch **32** to other subscriber ends **13** and **14**.
>
> Therefore, when an error occurs during transport of information, it is possible to check whether the error is generated by the metro network **100** and the core network **200**, but it is difficult to check whether it is generated by the access network **300** of the concentration channels **40**, **41**, and **42** or the access network **300** of the distribution channels **43**, **44**, and **45**.

'323 patent, 1:55-2:5.

118.    The written description of the '323 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from

and improved upon what may have been considered conventional or generic in the art at the time of the invention.

119.    Defendants have directly infringed (literally and equivalently) and induced others to infringe the '323 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '323 patent and by inducing others to infringe the claims of the '323 patent without a license or permission from OptimNet, such as for example inducing home and business internet customers to use the infringing system.

120.    Exhibit 7 is a true and correct copy of the '323 patent.  Exhibit 8 provides a description of the Accused Instrumentalities and a chart showing how they infringe claim 1 of the '323 patent, which OptimNet provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

121.    Defendants knowingly and intentionally induce and contribute to infringement of the '323 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or have been willfully blind to the '323 patent and the infringing nature of the Accused Instrumentalities for at least the reasons discussed above. *See* Introduction, which is incorporated by reference herein.

122.    Despite this knowledge, Defendants continue to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '323 patent. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '323 patent, thereby specifically intending for and inducing their customers to infringe the '323 patent through the normal and

customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

123.    Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers would constitute willful infringement of the '323 patent.  As discussed above, ETRI, the former assignee of the Asserted Patents, previously submitted an Intellectual Property Rights (IPR) disclosure to the International Telecommunication Union – Telecommunication Standardization Sector (ITU-T), alerting the public that it holds granted and/or pending applications for patents, the use of which would be required to implement the G. 989.3 standard.  This disclosure was made publicly available through ITU-T's Patent Information database, thereby placing the industry—including Defendants—on notice of ETRI's (and subsequently OptimNet's) patent rights in connection with standard-compliant implementations.

124.    Despite this public notice, Defendants continued, and continue, to make, use, and sell standard-compliant products without seeking a license or otherwise addressing OptimNet's intellectual property rights. Defendants' actions demonstrate, at minimum, reckless disregard for OptimNet's patent rights, and constitute egregious behavior sufficient to support a finding of willful infringement under the guidance set forth in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016).

125.    The requirements of 35 U.S.C. § 287(a) have been satisfied with respect to the '323 patent, and OptimNet is entitled to damages for Defendants' past infringement.

126.    OptimNet has been damaged by Defendants' infringement of the '323 patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## COUNT 5 – INFRINGEMENT OF THE '085 PATENT

127.    OptimNet incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

128.    On April 1, 2014, the United States Patent and Trademark Office issued U.S. Patent No. 8,689,805, titled "method and apparatus for transmitting data in optical transport network."

129.    OptimNet is the exclusive licensee of the '085 patent with all substantial rights in the '085 patent including, without limitation, the exclusive right to sublicense, sue for infringement, and collect all past, present, and future damages.

130.    The claims of the '085 patent were duly issued by the United States Patent and Trademark Office and are presumed by statute to be valid.

131.    The claims of the '085 patent are patent eligible under 35 U.S.C. § 101.

132.    The claims of the '085 patent are not directed to abstract ideas and recite technical solutions to technical problems related to OTN systems, specifically for transmitting data to improve error correction capabilities, e.g.:

> As such, when OTU4 transmits an optical signal of 100 Gbit/s or more, OTU4 has a transmission penalty higher than the existing OTUk (k=1, 2, 3). Therefore, definition of an error correction code having a performance higher than an error correction code of 4×256 bytes defined for error correction in the existing OTUk is required. More parity bits are required in order to improve the performance of the error correction code. Herein, when more parity bits are granted to the same information data, the bit rate further increases. That is, when the performance of the error correction code is improved as a transmission rate increases, the transmission rate further increases, thereby deteriorating the transmission performance.

'085 patent, 1:39-51.

133.    The written description of the '085 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

134.    Defendants have directly infringed (literally and equivalently) and induced others to infringe the '085 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '085 patent and by inducing others to infringe the claims of the '085 patent without a license or permission from OptimNet, such as for example inducing home and business internet customers to use the infringing system.

135.    Exhibit 9 is a true and correct copy of the '085 patent.  Exhibit 10 provides a description of the Accused Instrumentalities and a chart showing how they infringe claim 1 of the '085 patent, which OptimNet provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

136.    Defendants knowingly and intentionally induce and contribute to infringement of the '085 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or have been willfully blind to the '085 patent and the infringing nature of the Accused Instrumentalities.  As shown in the exemplary claim chart, the '085 patent reads onto the ITU-T G.709/Y.1331 standard.  Public information indicates that Verizon implemented the G.709/Y.1331 standard into its network. *See,* *e.g.,* https://www22.verizon.com/wholesale/solutions/solution/Optical%2BWave%2BService.html

("work is well underway for standards-based digital wrapper service known as ITU-T G.709"). As with the above NG-PON2 patents, ETRI filed a public disclosure confirming ownership of intellectual property rights for this standard. *See, e.g.*, https://www.itu.int/net4/ipr/details_ps.aspx?sector=ITU-T&id=G709/Y_1331-13. As part of ETRI's IPR Declaration, ETRI committed to "grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell implementations" of the G.709/Y.1331 standard. Thus, ETRI: 1) assisted in the development and implementation of standards to facilitate efficient and uniform transmission of reliable client signals over long-haul optical fiber networks; 2) properly notified the public that it holds granted and/or pending applications for patents, the use of which would be required to implement the standard; and 3) agreed to license the subject patents on a non-discriminatory basis and on reasonable terms and conditions. Despite the clear disclosure to the public, and further despite ETRI's representations that it would license the subject patents on a non-discriminatory basis and on reasonable terms and conditions, at no time did Defendants approach ETRI to discuss licensing any ETRI patents related to the G.709/Y.1331 standard. In short, Verizon either knew, or was willfully blind to the fact that it was infringing ETRI's patents.

137.    Despite this knowledge, Defendants continue to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '085 patent. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '085 patent, thereby specifically intending for and inducing their customers to infringe the '085 patent through the normal and

customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

138.    Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers would constitute willful infringement of the '085 patent.  As discussed above, ETRI, the former assignee of the Asserted Patents, previously submitted an Intellectual Property Rights (IPR) disclosure to the International Telecommunication Union – Telecommunication Standardization Sector (ITU-T), alerting the public that it holds granted and/or pending applications for patents, the use of which would be required to implement the G.709/Y.1331 standard.  This disclosure was made publicly available through ITU-T's Patent Information database, thereby placing the industry—including Defendants—on notice of ETRI's (and subsequently OptimNet's) patent rights in connection with standard-compliant implementations.

139.    Despite this public notice, Defendants continued, and continue, to make, use, and sell standard-compliant products without seeking a license or otherwise addressing OptimNet's intellectual property rights. Defendants' actions demonstrate, at minimum, reckless disregard for OptimNet's patent rights, and constitute egregious behavior sufficient to support a finding of willful infringement under the guidance set forth in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016).

140.    The requirements of 35 U.S.C.  § 287(a) have been satisfied with respect to the '323 patent, and OptimNet is entitled to damages for Defendants' past infringement.

141.    OptimNet has been damaged by Defendants' infringement of the '085 patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

**JURY DEMAND**

142.    OptimNet demands a jury trial pursuant to Federal Rule of Civil Procedure 38.

**RELIEF REQUESTED**

OptimNet prays for the following relief:

A.    A judgment in favor of OptimNet that Defendants have infringed the Asserted Patents, and that the Asserted Patents are valid and enforceable;

B.    A judgment and order requiring Defendants to pay OptimNet past and future damages arising out of Defendants' infringement of the Asserted Patents in an amount no less than a reasonable royalty, costs, expenses, and pre- and post-judgment interest, as provided under 35 U.S.C. § 284;

C.    A judgment and order requiring Defendants to provide an accounting and to pay supplemental damages to OptimNet, including, without limitation, pre-judgment and post-judgment interest;

D.    A judgment that Defendants' infringement is willful and enhanced damages and fees as a result of that willfulness under 35 U.S.C. § 284;

E.    A finding that this case is exceptional under 35 U.S.C. § 285, and an award of OptimNet's reasonable attorney's fees and costs; and

F.    Any and all other relief to which OptimNet may be entitled.

Dated:  June 12, 2025                    Respectfully submitted,

                                         */s/ Dale Chang*
                                         Dale Chang
                                         CA State Bar No. 248657
                                         Email: dchang@raklaw.com
                                         Kristopher Davis
                                         CA State Bar No. 329627
                                         Email: kdavis@raklaw.com
                                         Bradley Hyde
                                         CA State Bar No. 301145
                                         Email: bhyde@raklaw.com
                                         **RUSS AUGUST & KABAT**
                                         12424 Wilshire Blvd. 12th Floor
                                         Los Angeles, CA 90025
                                         Telephone: 310-826-7474

                                         **ATTORNEYS FOR PLAINTIFF,**
                                         **OptimNet LLC**